Mr. Goldstein, whenever you're ready. Thank you, your honor. Good morning. May it please the court, my name is Daniel Goldstein. I'm here on behalf of Yasmin Reyazuddin. Of the many issues raised by the briefs, I want to focus principally on two. First, that the district court erred in concluding that a public entity has no duty to refrain from creating communication barriers that make, by deploying workplace software that is inaccessible to an entire class of people based on their disability, in this case blindness. The second issue that I want to focus on is whether the court erred in holding on summary judgment that Montgomery County had proven that it was unduly burdensome for it to remediate the inaccessible software that it had bought. Those two issues are disconnected in the sense that one doesn't reach the undue burden issue in the context of remediation if one concludes that the county in the first place had an obligation not to buy inaccessible software. Is that first issue properly preserved in this case? It is, your honor. We raised it in the briefs to the lower court by asserting that the county had a duty not to be reactive but to be proactive and the court addressed it, rather strangely, but addressed it in its brief. It said there's no ex ante obligation and gave two reasons. First, the court said that we had only cited Title II cases with respect to the ex ante obligation. That was factually incorrect. We cited 1504 and two Title II cases on that point, but also given that this court has said repeatedly that Title II and 504 standards are to be applied interchangeably and the court recognized that elsewhere in the opinion, that's, we would suggest, an erroneous reason. The other reason that the court gave for saying there was no ex ante obligation was to refer to the notice requirement in Title I for reasonable accommodation, but of course reasonable accommodation is not the only requirement in Title I. Didn't you move or your client moved below to add a Title II claim to amend the complaint to add it and that motion was denied? We added, we twice moved. The first was with respect to the software issue and the court denied it saying 504 and Title II apply the same standards and since I am not going to follow my earlier opinion on where the federal monies have to go and I'm going to allow you to proceed on 504, there's nothing added and no good cause for adding Title II to that first count. The second count dealt with her subsequent attempt to get that job and that was brought under Title II, but again, I would suggest that this court has said, for example, in the Doe versus University of Maryland case, that we apply Title II and 504 interchangeably because we're instructed by Congress to do that in every respect except the solely by reason of disability language of 504 and the by reason of disability language in Title II. And second, more recently in a helping hand, well actually three reasons, in a helping hand the court said we import into Title II the other provisions of the ADA, but more particularly in Section 504 itself, it instructs reference to Title I of the ADA. So at the end of the day you're looking on one coherent set of standards. Doesn't 504 talk about making existing facilities reasonably accessible? We're talking about a new facility. Actually making existing, that's contained in Title III and applies to commercial facilities which include facilities that are public entity facilities and as Chief Judge Traxler I believe noted in the Constantine versus George Mason case, the Title II requirements are lesser. They're more congruent and proportional because they don't actually require a change until accessibility, until you're going to make a change. But they do, and here ironically Montgomery County was going from accessible software, which Ms. Rehazoon had, to something new which was inaccessible. And so the question becomes, and we would suggest it's properly before the court, can a public entity create new communication barriers? And if that's the case, then we're making the ADA and the Rehab Act effectively dead letters in the area of unemployment. That's a dramatic statement. The reason I say that is that software is ubiquitous in the American workplace. And if the district court is correct that you can create such barriers, there will be few, if any, jobs in the workplace, either for people who need the small accommodation of JAWS because they're blind, they have a processing issue because of dyslexia or because of a closed head injury, or they need voice command software because they lack manual dexterity because of arthritis or paralysis, or they have some other sensory disability. And the great irony of this is that digital technology is zeros and ones. It's not inherently visual. It's not inherently tactile. It's not inherently audible. It has to be rendered to one of those senses for us whether we're disabled or not. So it's the great leveler in the workplace. And Montgomery County's adoption of the Siebel software is a great case in point because the record discloses it's not just Mrs. Rehazudin and the call center that's affected. This Siebel software has now been, as the record shows, adopted by 28 departments within Montgomery County to know who's requested a pothole fix and where, who's asking for a building permit. So, in effect, Montgomery County's failure to make this accessible creates a disability-free environment, at least for those who are blind, throughout the county. It's no wonder that they haven't been able to find her a meaningful job. We certainly require, as you pointed out with respect to existing facilities, we certainly require that public entities make workspaces physically accessible when they make new ones to the maximum extent feasible. But that's not the only proactive thing we require. In Title I, we require that employers not create eligibility requirements that discriminate against an entire class of people unless, because nowhere is the ADA or the Rehab Act a blank check, unless business necessity requires it and the qualification is job-related. So, in this particular instance, if, say, Montgomery County had looked everywhere for accessible call center software, and that's counterfactual here, because we know from the record that there were accessible call centers using Siebel software elsewhere at the time that Montgomery County adopted the Siebel software. But if they'd been able to show this is the only thing that fits the bill, and so vision is going to be a qualification standard, they could have met Title I. But having bought the inaccessible software, vision became a qualification, not one that's inherent to the job, but the result of Montgomery County's choice. The county, for its part, has said to you that we do have to be digitally accessible, but only to outsiders. Those who use the Montgomery County website or are trying to get information about bus schedules. But the language of Title II and of 504 speak of all of the programs and activities. In the case of 504, those that receive federal monies. In terms of Title II, those that are public entities. And there's no distinction drawn, nor does any case, nor does any regulation suggest drawing a distinction between inward-facing and outward-facing. And indeed, if such a distinction were possible, then the county could build inaccessible workplace offices. As long as the public could get to the public parts, you could just deny people with mobility impairments access to a new facility by building the employee parts with steps and the like. I would propose now to turn to undue burden, unless the court has questions about this preexisting obligation. So, even if the court decided, and Judge Diaz, I hope this is not the case, but even if you decide this was not properly preserved for appeal, it is an entirely separate issue whether having bought the software, it was unduly burdensome and could be so held on summary judgment. I'd point to three critical facts that make it apparent that the district court erred. First, Siebel is used countywide, so the impact goes well beyond the single employee, Ms. Rehazudin. You were talking about if there is no fix, that blind applicants for jobs throughout the county need not apply. Second, Siebel and other call center software has been used by blind employees elsewhere in the U.S., and this was true in 2009. Our expert testified that she had configured two CTI toolbars in Siebel to be accessible for two other call centers. The fact that it has been done elsewhere has been recognized in ACB versus Paulson and a host of other cases as being very significant in measuring undue burden. Third, the cost of the fix, according to our expert, was less than one-fourth thousandth of the county budget. What is the cost? I just want to make sure my figures are right. And your figures, what is the actual cost to the county? Our expert said $129,000 to make the widget. She did not talk about the maintenance cost, but there is evidence in the record from their experts that maintenance cost tends to be about one-fourth of the cost of the upgrades. That would be $32,000. Every year? Every year. And the question is, now, against what do you measure that? Do you measure it against MC311, which cost $11 million but saved $10 million? Do you measure it against the $80 million tech modification that was paid for in part with federal funds? Or do you look at the $3.37 billion operating budget for fiscal 2011 for Montgomery County? And I suggest it's the last because this is countywide used software. The court never indicated which entity it was finding was unduly burdened. The undue burden some analysis is not one that says, here's a cutoff. With existing facilities, more than 20% is not considered by regulation to fall within maximum extent feasible. Would $126,000 be okay or $135,000 not be okay? It's a multifactorial analysis. You look at the effect on other employees. We've said this is countywide. It's just not the kind of thing that is susceptible to a summary judgment decision, at least not on facts like these, where the judge is rejecting some things and accepting others, whether it's the expert opinion or saying, you know, those other call centers were private call centers and without explanation saying, therefore, I don't have to consider them. This undue burdensome issue is a question for the jury. I just want to quickly make reference to her current situation where she is in a job that doesn't exist. She's an informational and referral aid in a division that has no such job title. Her job duties are to handle referrals that are not part of the adult and disability and the aging division in which she works. She works at most an hour or two a day. Chief Judge Traxler in the Bella case, which is unpublished but recited, the per curiam opinion says that languishing with no job duties is an adverse job action. And in the James case, in which you were also in the panel, that an adverse job action exists if it affects benefits and conditions. So this was hardly a reasonable accommodation. She's still in a temporary position with nothing to do. And the fact that she is still there is a testament to why the issue of buying accessible software, which affects every division in the county, is such a critical issue. Other opportunities that she rejected? The one other... It's not like it was this choice or that. Unfortunately, Chief Judge Traxler, it was. At the time that she was said, you know, there could be a job for you in child services, while we wait to transfer you to MC311, it was, the record is absolutely clear that that was offered as one of two temporary choices, not a permanent job position, not a vacancy. But simply, at that point, everybody still thought, including Ms. Rae Azudin, that things were going to be fine, they were going to make the fix, and she was going to go to the call center. Is that the only other choice? That's the only other choice, yes, Your Honor. I thought the district court opinion recited that your client periodically would search the county's work database to find jobs, but nothing that, quote, would interest her. How does that... Well, she was still hoping for this job, but at most, the obligation is that the employer reassign her to a vacant position that's not adverse, and that they've never done. They don't need her to be searching for jobs. They can make a reasonable accommodation by saying, here's your new job, you're capable of doing this, it's at your grade, be at work Monday morning. I see I'm out of time. You'll be back for reply. Let's hear from Ms. Henry. Good morning, Your Honors. I'm Karen Fetterman Henry, speaking to you today on behalf of Montgomery County. With me at council table is Patricia Lissahora Cain. Both of us are from the county attorney's office. Let me address the issues in the same organization that Mr. Goldstein just did. Starting with the duty that is being alleged that the county might have had to always seek out and obtain accessible software, no matter what program it is acquiring it for. In the context of this case, this was part of an overall modification of the county's technology systems, as well as a transformation of the way the county was doing business. It started with an enterprise resource planning project that combined all of its core financial resources and obtained software to do that and reassigned staff and eliminated staff. There were many positions lost over the course of this project. The 311 call center was the next leg of the county's cost-saving measures, its efforts to streamline its processes, because up until the creation of that center, it had similar call centers sprinkled around the county in different departments. This was an effort to make sure that the community serving the public could call one number at any given time and be directed to the right place for the services they needed, or to get information. When is my library open? Can you come out and fill this pothole? When is my recycling going to be collected? It was an overall global effort, and the county, in exploring products that would facilitate its call center, spoke with a variety of vendors. The kind of, what do you have? What can work for this call center? Explained the issues. Explained it's a county government. Explained we have an array of services. Explained we are paring down the number of people that are going to be answering these calls. It's not going to be the same number of people that we always had out in the departments. All of the vendors recommended similar products. They all recommended a product that had a computer telephone interface component to it, so that basically the call takers can answer the phone from the computer. It facilitates information gathering. It facilitates a prompt answer to the caller. It helped with statistics, the performance of the call takers, as well as the nature of the calls the county is getting. This was a core feature that was essential to the county's business needs in creating a call center separately from operating the way it always had. It was assured by each vendor that their respective products were ADA compliant. The county had no reason not to think that that might be wrong. So the county proceeded to purchase a product that was perfectly compatible with what it already had for its enterprise resource planning component. Because one of the benefits of that was the compatibility. It was going to be easier to have the two systems talk to each other and not have to maybe build something to connect the two. It was going to allow the call takers to access data that they might need from the ERP system. So that was a great attraction. It was going to help with the speed component and the limited resources that were going to man this center. As the county proceeded in installing this, it bought it off the shelf. It did not ask any vendor to create something for it. So I suggest that that makes this significantly different from building a structure where you are asking a builder to build something, and some of these features can be factored in. When you're buying a product that exists, it's been proven, it's been tested, you know it's going to work, it's going to have fewer problems and fewer bugs, you're paying a certain amount for that. The county did that. It didn't need to ask for a specific product to be created for it. It didn't do that. So while it was installing that, it was then getting around to how to staff this center. Do we bring in new people? Do we hire a contractor to come in and use this system? Do we use existing county employees? Ultimately the decision was made to rely on existing county employees. But as I mentioned, not everyone who served a call-taking function countywide was transferred to the call center. Again, it was going to be a higher level of intensity, a much different type of call center than anyone in an existing center had experienced in the county yet. But an appellant was told that she would be transferred to the call center repeatedly. That was the expectation. That was the expectation. You're right, Your Honor. What the record shows, though, is that it was an expectation, but it was not necessarily a definite decision, and that in the end, because these were technically involuntary transfers, there were plenty of call takers in other call centers that had no interest in going to this new call center. So it was a management decision who to transfer, whether to transfer, and when it became apparent that this product was not, in fact, accessible to a vision-impaired call taker, the county explored its other options. That's different. That really shifts into the reasonable accommodation piece of this case, and I would suggest that the district court conducted that analysis absolutely correctly. Among the clear facts in this case, although this is a county system, not every employee in the county accesses this system. The call takers in the call center need to. That is part of their daily work. It's integral to their function as call takers, and it helps them in handling anywhere from 55 to 70 calls a day. That's a lot of time on the phone, a lot of checking, drop-down checklists, and pulling information. In the departments that are providing the services, there may be a handful of people that are accessing it to provide that information then to the crew that's going to go fill that pothole that you complained about or to the solid waste folks to bring you another recycling bin. The people performing those functions may never enter the system. So this is not as broad as it's been presented. It's much more narrowly used. Where you get into the reasonableness is if the county has to create a product, the record was clear. For the county to make the 311 center accessible now, it has to do one of two things. It has to buy the next upgrade of the product it bought, install that, configure it, and hope that it works, which is even more expensive than the workaround that Ms. Rae Zudin's expert proposed. She said she could build something, but again, that's not going to be built by the same company that the county bought its first product from. The practical implication of that is that there will be more work to be performed, more man-hours, more time and resources, and more expense to make the two systems compatible. I thought the district court's decision in this case with respect to reasonable accommodation was based solely on cost. She just didn't buy the plaintiff's expert's evaluation as the cost, but that seems to me to be a quintessential judgment for the prior fact. Well, Your Honor, in this case, I have to disagree because what the record was showing, and this is what the district court had in front of her, although she did reject the plaintiff's expert's dollar numbers, even looking at those numbers, you're looking at an estimated $200,000 to upgrade or reconfigure or do something to the existing system to make it usable by a vision-impaired person. That's just to set it up, and that's without knowing whether it's tested or proven. None of these items that were proposed were tested or proven, so you have a certain amount of time that would be added to that cost-wise and resource-wise to make it work and make it work effectively and efficiently and accurately. On top of that, you have an annual amount that is approximately, we'll go with the lower figure, $32,000 a year. It could be more if the county's expert's option was used. That's going to be every year, and when you look at those numbers, instead of looking at them solely in the context of the full county budget, look at them a different way. The $200,000 installment to create the system is effectively four times Ms. Raizudin's salary as of 2012, so that's essentially telling the county it has to pay for four additional employees. Is Ms. Goldstein going to agree with your numbers when he gets up? I hope so. I mean, these are basic comparisons. The numbers are in the record. If he agrees with the $200,000 for purposes of discussion number, I think he needs to. Do you have any case where a court has found as a matter of law that an undue hardship is simply not, a county need not proceed because of undue hardship as a matter of law, based on facts similar to this? Unfortunately, I have not seen cases that dealt with this software aspect. I don't know that it needs to be software. I'm just talking in the context of a $160,000 upgrade plus a $32,000 modification in the context of a budget which is $4 billion. Or even if you accept the lower figures, do you have a case where a court ruled as a matter of law that that simply is an unreasonable accommodation because of hardship? At this point, I have to say no, Your Honor. What does that suggest to you? It suggests to me that this is a difficult case. I don't think it suggests that it's wrong as a matter of law. Let me explain why. I think because this was a two-fold thing. It's partly the cost. I know that's what the district court relied on, and that's a compelling argument. They ignored it. They refused to accept it. It's a significant cost. Well, assuming that your numbers are correct, it may very well be, it may not be, a jury may disagree with your numbers, but the district court just simply ignored the lower cost and said I'm not accepting that in large part because your expert or their expert are not accounted for these annual maintenance costs. Is that right? That's what the district court said. And I would suggest that even relying on the expert's numbers, because the expert did say it would cost somewhere between $129,000 to $193,000 to set up the system, and then she agreed there would probably be about a 20% per year annual maintenance and operation cost. That's in there. Even if the county doesn't dispute that, those are significant costs. When you look at what it means as far as other employees, the ongoing cost, and the fact that the cases that have reversed a summary judgment entry have done it because there's been a clear dispute of a material fact, not that the facts needed evaluation of whether the jury agreed with them or not or thought that was reasonable. For example, in the case with the firefighter who was blind in one eye and he couldn't drive apparatus anymore. He sought an accommodation where he didn't have to drive any of the vehicles. And the department had relied heavily on the National Fire Protection Association standards, which it had never adopted. The court there found a dispute of material fact because the department was relying on something it hadn't clearly adopted, and there was evidence in the record that suggested that other firefighters didn't necessarily drive the vehicles either. So it suggested that the accommodation being proposed was reasonable. There were facts going both ways. It was a dispute of material fact. This record doesn't present that. What about the fact that, as Mr. Goldstein points out, there have been other entities, albeit maybe exclusively in the private sector, that have been able to accommodate this change? I think, Your Honor, again, looking at this record, there are general assertions that other call centers are able to do this. There's no detailed information which I suggest is necessary to create a factual dispute. There's nothing to show how many call takers there are, the nature of the calls, how many calls a day they need to take, whether this was planned at the beginning so that some of them said, oh, we want to set this up with all vision-impaired call takers. That would be a different shopping excursion for the entity creating that call center than the situation that the county encountered. There were no detailed facts about those call centers to be able to compare them to the county's call center and create that factual dispute. Simply asserting that they exist, the same could be said of what the county had in the past. In the past, it had call centers within the departments, and they were susceptible to a vision-impaired call taker. In Mason's undue hardship determination, did the district court consider the overall financial resources of the county or just the reasonable accommodation budget? She had evidence of both, and so I don't know that she said specifically which one she relied on, but I think in looking at both, again, if you look at the countywide budget, you have the situation where every dollar is accounted for, the director of finance explained the need for a balanced budget, and the need for if this money is found somewhere, it means something else is being given up, whether it's other positions are eliminated, other programs are eliminated. Something has to give. It's not just that the county has a pocket of money somewhere to dip into for something like this. The judge also had in front of her the department-wide version, which was showing 70% of its budget for several years was personnel, it was people, and about $200,000 of that each year was for the operation and maintenance of the existing system. And so, again, those dollars were fully accounted for and to have to basically double what was budgeted for the software operation and maintenance to accommodate one employee who, in fact, was already being accommodated at HHS. That's another point that's been overlooked a little bit in this discussion, is that Ms. Rhea Zudin continues to be employed in the Department of Health and Human Services. She continues to be accommodated and use her JAWS screen reader for her duties and to handle phone calls for the man of food referrals. Although apparently not fully engaged, she says. And in large part, that is a result of the creation of the call center. A lot of calls now go to 311 and are being directed to the right place or a different place than they were in the past. That's true of all the departments. But the county has, as this record shows, and it's not disputed, the efforts the county has taken to fill that time, to discover what duties do still need to be done. There have to be plenty that don't require the 311 system, that still use a telephone and a regular computer system so that the JAWS reader will work with it. And it has tried several different efforts within the Department of Health and Human Services. That is a reasonable accommodation. It doesn't require an excessive cost for the county, nor does it impose the administrative burden that configuring either a second system or a new system in the 311 call center would impose on the county at this juncture. Because it has moved so far down the road, you're looking at a lot more configuration that would have to occur, and with that always goes time and cost. Ms. Henry, at the very beginning of your argument, you indicated that the county had been represented that this software was in fact ADA compliant. Why then isn't the onus on the contractor to fix this problem so that the county doesn't have to dip inside its funds to do that? I'm not sure the record says this, but my suspicion is that because it was a commercial off-the-shelf product, which you basically get what you get rather than a built product, there's more you can go back to the contractor with if they built it for you and said, yeah, yeah, yeah, it's going to be ADA compliant. If they're wrong, then you make them fix it. If it's already packaged, tested, it's not clear that there would be anything they can do. At this point, the vendor would be more likely to say, because we've worked on the bugs and corrected the problems. The representation was made to you, and you purchased on the basis of that representation. We did rely on it, yes. You don't have any responsibility to find out. So is this like an oral representation made by a salesman? Is it something on the package? The record wasn't entirely clear. Usually there would be a combination, I would think. Is it your argument, we thought this was ADA compliant, it wasn't until after we got it? Well, in some respects, maybe not that simply stated, because the testimony from the decision makers and from the folks that were configuring the product, when they described their search for software for the call center, they explained who they talked to, what they were advised, and that all of them assured them it was ADA compliant. So I think it was an effort to comply, but again, that gets back to where we started, that assumes, if I may finish, Your Honor, that there is an affirmative duty to always make sure that everything, everywhere, is accessible to everyone, which I'm not sure that any of the statutes at play here or any of the case law interpreting accommodating existing employees would require that. But apparently it was a concern because the subject would never have come up if that wasn't, I guess, important. Well, because it has been a developing issue, I will concede that. Okay. Thank you, Your Honor. Let's hear the reply. Thank you, Your Honor. First, with respect to Judge Diaz's earlier question, at JA 1247 is where the district court addresses the ex-ante issue. Second, with your question about cases that say that undue hardship is not suitable for summary judgment in the average case, we cite four cases that footnote four of our opening brief, but I would point in particular to one that's discussed elsewhere in our brief, Bryant v. Better Business Bureau that Judge Davis authored before he ascended to the purple, in which he does a very detailed job of explaining why undue hardship is a fact-intensive, multifaceted inquiry that's not suitable for resolution on summary judgment. I realize it's a district court opinion, but it is an analysis that I think bears looking at. I do disagree with my colleague when it comes to the question of costs. She made repeated references to the cost of buying the patch. Peter Wallach at Oracle testified as Oracle's designee in deposition, and he testified that version, and I'm sorry to take you into the weeds, 8.1.1.3 was released in July 2010, that it solved the problem of the CTI toolbar, the smart script issue, and the email response issue, that it was free to Montgomery County because it was an update of their license, and that in fact Montgomery County downloaded it according to Oracle's records, because they can see who downloads it, in August of 2011, but apparently never chose to configure it. So there may have been configuration costs, but the repeated claims by Montgomery County that there would have been an upgrade software purchase cost simply don't hold water, and indeed their own expert, Stephen Heisner, agreed that that particular upgrade is included in the annual licensing fee. So this, I think, demonstrates yet again why this is not the kind of case that should have been decided on summary judgment. Corporal, indulge me for the rest of my notes at the corner of my table. I apologize. We're not saying that you always have to buy accessible software. I think you do have to seek it out, but again the ADA and 504 are not blank checks, even on physical accessibility. There's either the limitation of undue hardship and fundamental alteration, or there's the limitation of business necessity that's mentioned in Title I. There's maximum extent feasible with respect to renovating new facilities for physical accessibility. I would submit that there's no logical basis in the ADA for parsing out physical accessibility from digital accessibility or from parsing out the obligation to the public to the obligation to your employees, and it's hard to imagine something that would more defeat the purposes of the Rehab Act and the ADA as technology becomes a pandemic. The statement that she has been accommodated is contradicted by the testimony of her supervisors that the work she does are not duties of the division in which she works, that the work doesn't exist, that they simply intended this as a temporary stopgap until they transferred her. These are all evidence, I submit, that she has not been adequately accommodated when she sits around being paid to do nothing with no prospect of promotion or advancement. So I would conclude by suggesting to the Court that this case is worthy to be reversed and remanded for trial. It is not blindness that has kept Ms. Rehazuddin from the work she seeks, nor any other characteristic that's personal to her. Rather, it comes from a decision by Montgomery County to select the software that prevents her. And I must point out, the cost should not be all attributed to her because the effect of not making this fix is the blind need not apply, not just to MC311, but for any job in the other divisions that does use this software. This is a blanket ban, and the cost has to be looked at in that regard. Montgomery County has chosen to deploy a workplace software that discriminates against an entire group based on their disability. In doing so, we submit, we ask the Court to find, that this should be remanded so it can be determined whether it is engaged in discriminatory conduct. Thank you. Thank you. We'll come down and greet counsel and then go into our last case.
judges: William B. Traxler Jr., Albert Diaz, Stephanie D. Thacker